ESTATE OF CORDIAL GRYDER, DECEASED, PANSY GRYDER, EXECUTRIX, and PANSY GRYDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF CORDIAL GRYDER, DECEASED, PANSY GRYDER, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Gryder v. Commissioner
Docket Nos. 3785-76, 9423-76.
United States Tax Court
T.C. Memo 1981-466; 1981 Tax Ct. Memo LEXIS 275; 42 T.C.M. (CCH) 878; T.C.M. (RIA) 81466; August 27, 1981; As Amended September 15, 1981 Irl B. Baris, for the petitioners. William J. Falk and Henry T. Schafer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the income tax and additions to tax of Cordial Gryder (now deceased) and Pansy Gryder for the years and in the amounts as follows: Deficiencies
Additions to Tax
in
I.R.C. 1954
Calendar Year
Income Tax
Section 6653(b) [1]
Dec. 31, 1967
$ 3,699.74
$ 1,834.87
Dec. 31, 1968
46,512.95
23,256.48
Dec. 31, 1969
3,694.54
1,847.27
Dec. 31, 1970
12,724.06
6,362.03
Dec. 31, 1971
3,839.13
4,289.07
*275 Respondent determined that Cordial D. Gryder (now deceased) is liable as transferee of DeVille Motors, Inc. for income taxes and additions to tax of DeVille Motors, Inc. for the years and in the amounts as follows: Deficiencies
Additions to Tax
in
I.R.C. 1954
Calendar Year
Income Tax
Section 6653(b)
Dec. 31, 1967
$ 25,297
$ 12,649
Dec. 31, 1968
35,529
17,765
Dec. 31, 1969
12,873
6,437
Dec. 31, 1970
36,703
19,491
The issues for decision are: (1) Whether the income tax returns filed by Cordial D. Gryder and Pansy M. Gryder for each of the years 1967 through 1970 were false or fraudulent with intent to evade tax so that the statute of limitations does not bar the assessment and collection of taxes for these years or, in the alternative as to the years 1969 and 1970, whether there was an omission of income on the joint returns filed by Cordial D. and Pansy M. Gryder of more than 25 percent of the income reported so that the statute of limitations provided for in section 6501(e)(1)(A) is applicable. (2) What is the amount of the underpayment of tax by Cordial and Pansy Gryder for each of the years 1967 through 1971 and whether any part of *276 the underpayment for each of those years was due to the fraud of Cordial Gryder or to the fraud of Pansy Gryder so as to cause the additions to tax under section 6653(b) to be due by either or both of them. (3) Whether the returns filed by DeVille Motors, Inc. for each of the years 1967 through 1970 were false or fraudulent with intent to evade tax so that assessment of tax against Cordial Gryder as transferee of DeVille Motors, Inc. was not barred by the statute of limitations at the time of the issuance of the notice of transferee liability to Cordial Gryder. (4) What is the amount of the underpayment of tax by DeVille Motors, Inc. for each of the years 1967 through 1970 and whether any part of the underpayment of tax for each of those years is due to fraud so as to cause the additions to tax under section 6653(b) to be due by the corporation. (5) Whether the Estate of Cordial Gryder, Deceased, Pansy Gryder, Executrix, is liable as a transferee for any deficiencies and additions to tax due by DeVille Motors, Inc. for the calendar years 1967 through 1970. (6) Whether Pansy Gryder is an innocent spouse within the meaning of section 6013(e) and therefore should be relieved *277 of liability with respect to omissions of income from the joint returns she filed with her husband Cordial Gryder. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. During the years 1967 through 1971 Cordial Gryder and Pansy Gryder, husband and wife, filed joint individual income tax returns. At the time of the filing of the petition in this case Cordial Gryder was deceased and Pansy Gryder, [2] who resided in High Hill, Missouri, was the executrix of his estate. The following shows the dates on which the returns of Cordial and Pansy Gryder (hereinafter sometimes referred to as petitioners) were filed for the years indicated and the amount of tax liability reported on each of those returns: Calendar
Tax
Year
Date Filed
Per Return
1967
4/25/69
$ 818
1968
4/15/69
813
1969
4/15/70
2,196
1970
4/15/71
2,880
1971
2/20/73
4,739
DeVille Motors, Inc. (DeVille) was a corporation organized under the laws of the State of Missouri *278 on February 16, 1962. Cordial Gryder owned 98 percent of the stock of DeVille at all times here relevant. Pansy Gryder owned 1 percent of that stock, and Wayne Gryder, a nephew of Cordial Gryder, owned 1 percent of the stock. The corporate charter of DeVille was forfeited and canceled by the Secretary of State of Missouri on January 15, 1973, effective January 1, 1973, for failure to file the annual registration report and antitrust affidavit and for failure to pay the annual registration fee for the year 1972. Prior to the cancellation of the corporate charter of DeVille, Pansy and Cordial Gryder were listed on each annual registration report filed by the Secretary of State of Missouri as being an officer and director of DeVille as of the date of such report. During the years 1967 through 1971, DeVille's total paid-in capital was $ 500. DeVille filed U.S. Corporation income tax returns for the years and on the dates set forth below showing thereon the tax liability indicated: Calendar
Tax
Year
Date Filed
Per Return
1967
12/13/68
1968
12/30/69
1969
3/17/71
1970
9/20/71
$ 2,278
Cordial Gryder was the president or secretary and the responsible *279 officer of DeVille throughout the years 1967 through 1970. Wayne Gryder was the vice president or secretary-treasurer and sales manager of DeVille during the years 1967 through 1970. Cordial Gryder hired all the major employees of DeVille. He employed Marjorie Hoch, the bookkeeper, and engaged the services of a certified public accountant, Marvin Blum, for DeVille. Cordial Gryder was responsible for handling the purchasing of vehicles and the financing of those purchases for DeVille and for resolving all major problems of the corporation including cash flow problems. Ms. Hoch was the bookkeeper for DeVille during the years 1967 through 1971. During the years here in issue, DeVille had four principal bank accounts, each at the Colonial Bank, Des Peres, Missouri. Account No. X-X120-1 was the DeVille checking account over which Cordial Gryder had the signature authority. Account No. X-X143-9 was the DeVille reserve account No. 1 over which Cordial Gryder had sole signature authority. Account No. X-X118-0 was the DeVille reserve account No. 2 over which a bank official had sole signature authority. Account No. X-X116-4 was the DeVille credit life insurance account over which *280 Cordial Gryder had sole signature authority. In addition to these major bank accounts DeVille also maintained during some or all of the years here involved the following business bank accounts: Signature
Bank
Account Type
Account No.
Authority
Citizens Bank of
DeVille Motors-Truck
XX-403-9
C. D. Gryder
University City
Camp Division
Citizens Bank of
DeVille Motors
XX-341-5
C D. Gryder
University City
Reserve No. 1
Citizens Bank of
DeVille Motors
XX-342-3
Bank Officer
University City
Reserve No. 2
Only
Citizens Bank of
DeVille Motors-Truck
XX-405-5
Unknown
University City
Camp Division,
Reserve Account
St. Johns
DeVille Motors
XX1-952
C. D. Gryder
Community Bank
Checking Account
St. Johns
DeVille Motors
XX1-968
Bank Officer
Community Bank
Reserve No. 2
Only
During all of the years here in issue numerous personal obligations of Cordial and Pansy Gryder were paid by checks of DeVille at the direction of Cordial Gryder. In January 1960, Cordial Gryder purchased a home and the land on which it was situated on Orchard Drive in Florissant, Missouri (hereinafter referred to as Orchard Drive). He resided in this *281 home from the time of its purchase until May 1969. Cordial and Pansy Gryder were married in December 1961 and from the date of their marriage until May 1969 Pansy Gryder also resided in the home on Orchard Drive. The following schedule shows (1) the date and amount of checks drawn on the account of DeVille for mortgage payments on the Orchard Drive property and in one instance an escrow shortage on that property, (2) the entry with respect to the payments made on DeVille's journal, and (3) whether or not the item was deducted on the corporate tax return of DeVille: How Treated
Date
Journal Entry *
on Corporate
of Payment
Amount
Explanation
Return
4-05-67
$ 569.45
Genl-Loan
5-12-67
251.68
Genl-Loan
Not deducted
9-07-67
503.36
Genl-Loan Pmt
Not deducted
10-18-67
251.68
Genl-Loan 13-OIO
Not deducted
12-12-67
253.68
Genl-Loan Pmt
Not deducted
6-01-67
251.68
Floor Int.
Deducted
11-07-67
251.68
Floor Int.
Deducted
7-11-67
251.68
Purchases
Deducted
3-05-68
253.68
Floor Plan
Not deducted
11-13-68
308.02
Qtrly License
Not deducted
& Taxes
1-09-68
253.68
Genl-Loan Pmt
Not deducted
2-13-68
253.68
Genl-Loan Pmt
Not deducted
5-08-68
253.68
Genl-Loan Pmt
Not deducted
6-06-68
253.68
Genl-Loan Pmt
Not deducted
7-02-68
253.68
Genl-Loan Pmt
Not deducted
8-13-68
253.68
Genl-Loan Pmt
Not deducted
10-21-68
507.36
Genl-Loan Pmt
Not deducted
12-11-68
253.68
Genl-Loan Pmt
Not deducted
1-31-69
511.40
Genl-Loan Pmt
Reduced sales
3-13-69
255.70
Genl-Loan
Reduced sales
*282 In May 1968, petitioners purchased property at High Hill, Missouri, for $ 35,000 consisting of 57 acres of land with a residence thereon. They made substantial improvements to the residence prior to moving into it in May 1969. After moving into the residence in May 1969, it was their principal residence. The following schedule shows payments made by checks of DeVille in connection with the purchase of the 57 acres of land with the residence thereon at High Hill, the improvements made on and furnishings for the residence, how the payment was listed on DeVille's journal and whether or not the payment was deducted by DeVille on its Federal income tax return: How Treated
on Corporate
Date
Amount
Journal Entry
Return
How Funds Used
5-10-68
$ 19,873.23
Not on journal
Not considered
Part purchase
price
5-10-68
15,000.00
Not on journal
Not considered
Part purchase
price
12-23-68
192.00
Unit Exp/Repairs
Deducted
Gold leaf king size
headboard & medallions
8-20-68
154.63
Car repair
Deducted
Plumbing supplies
10-08-68
412.04
Unit Exp/Repairs
Deducted
Boiler, etc.
5-31-68
300.00
Genl-O'Fallon
Deducted
Carpentry
6-07-68
375.00
Genl-O'Fallon
Deducted
Carpentry
6-14-68
456.25
Genl-O'Fallon
Deducted
Carpentry
6-24-68
412.50
Genl
Deducted
Carpentry
6-24-68
25.25
Genl-Labor
Deducted
Carpentry
cost
9-18-68
$ 390.62
Genl-Outside
Deducted
Carpentry
Serv.
10-04-68
200.00
Lot Expense
Deducted
Carpentry
10-21-68
262.50
Lot Expense
Deducted
Carpentry
7-01-68
421.87
Genl-Labor
Deducted
Carpentry
7-09-68
381.25
Genl-Outside
Deducted
Carpentry
Serv.
7-22-68
275.00
"      Deducted
Carpentry
7-26-68
225.00
"      Deducted
Carpentry
8-12-68
365.63
Genl-Labor
Deducted
Carpentry
8-26-68
375.00
Genl-Outside
Deducted
Carpentry
Serv.
9-02-68
396.87
"      Deducted
Carpentry
9-02-68
160.00
"      Deducted
Carpentry
7-15-68
362.50
"      Deducted
Carpentry
7-02-68
21.00
"      Deducted
Carpentry
7-09-68
25.50
"      Deducted
Carpentry
7-22-68
16.50
"      Deducted
Carpentry
7-26-68
7.50
"      Deducted
Carpentry
8-19-68
396.87
Genl-Refund
Deducted
Carpentry
10-28-68
525.00
Comm'n/Bird
Deducted
Carpentry
Dog
11-04-68
431.25
"      Deducted
Carpentry
11-11-68
362.50
"      Deducted
Carpentry
11-20-68
156.25
"      Deducted
Carpentry
8-19-68
$ 900.00
Genl-0-Fallon
Deducted
Lumber, supplies
11-26-68
1,578.21
Lot Expense
Improvement-
Amortized-5 yrs.
Deepened well
10-18-68
1,500.00
Lot Expense
"          Locks, doors, etc.
10-28-68
520.44
Lot Expense
"          Tile
12-06-68
1,709.92
Lot Expense
"          Kitchen cabinets &
bathroom plumbing material
10-23-68
925.00
Lot Expense
"          Drywall & painting
9-20-68
384.00
Lot Expense
"          Complete electrical
rewiring
12-09-68
240.00
Lot Expense
"          "     9-20-68
384.00
Lot Expense
"          "     12-09-68
360.00
Lot Expense
"          "     9-20-68
384.00
Lot Expense
"          "     12-09-68
360.00
Lot Expense
"          "     11-12-68
355.00
Comm'n/Bird
Deducted
Installed tile
Dog
11-08-68
42.00
Air conditioning & ducts
5-23-69
305.00
Not on journal
Lumber, supplies
1-17-69
457.30
Lot Expense
Deducted
Drain tile & back-filling
2-13-69
123.00
Lot Expense
Deducted
Insulation installed
12-12-69
132.24
Lot Expense
Deducted
Concrete
1-22-69
698.52
Unit Exp/Repairs
Deducted
Spiral
staircase
6-25-69
460.19
Office Expense
Deducted
Gold fixtures/bathroom
supplies
*283 In January 1970 petitioners purchased the interest of Charles Fisher and Denise Fisher in a 40-acre plot of land in High Hill, Missouri, with a house thereon at a contract price of $ 27,000 with $ 10,250.20 to be paid at closing. The $ 10,250.20 was paid by a cashier's check drawn on the DeVille credit life insurance account No. 0-1116-4 at Colonial Bank. The cashier's check was drawn to the order of Cordial Gryder and endorsed over by him to Tony Podorski Real Estate Co. which acted as the agent in the purchase of the 40-acre plot in High Hill. No amount was reported on the joint income tax return filed by petitioners for the year 1970 with respect to the $ 10,250.20 used as a payment on this property. The transaction was not recorded on the DeVille disbursements journal for the year 1970, but the $ 10,250.20 was taken as a deduction by DeVille on its corporate income tax return for the year 1970. On July 27, 1967, John N. Frey, Jr., purchased a motor home from DeVille for a cash sales price of $ 6,900. Mr. Frey owned a parcel of land in Woodland Park Harbor, St. Charles County, Missouri, and he negotiated with Cordial Gryder for a trade-in allowance for that land on the *284 purchase price of the motor home. Mr. Frey was allowed a $ 4,200 credit against the purchase price in exchange for the execution of a warranty deed for the parcel of land to Jimmie L. Beights. Mr. Beights executed a note and deed of trust to Cordial Gryder on September 27, 1967, the note being in the amount of $ 4,281.48. Mr. Beights died after defaulting upon the note and a successor trustee under the deed of trust conveyed the Woodland Park Harbor property which secured the note to Cordial Gryder. The trade-in of the land on the motor home appeared on the DeVille sales journal but not on its receipts journal. The land was not included in the DeVille inventory for the year 1967. On December 1, 1967, Eldred McGraw purchased a 1966 Cadillac from DeVille for a sales price of $ 4,500. Mr. McGraw drew a $ 300 check and a $ 3,500 check in partial payment of the sales price of the Cadillac and discharged the balance of the sales price by a trade-in of a piece of land in the Woapalanne Subdivision, Madison County, Missouri. Mr. McGraw received a $ 700 credit against the purchase price for the Woapalanne property which he deeded to Cordial Gryder and/or Pansy Gryder. The sale of this *285 Cadillac is not reflected on the DeVille sales journal for 1967 and only $ 300 of the amount received from the sale is reflected on its receipts journal for that year. In July 1970, John Weekley purchased a Champion motor home from DeVille for a contract price of $ 9,400. In payment for the motor home, Mr. Weekley transferred 110 acres of land to Cordial Gryder and paid the 1969 real estate taxes on that land. The land trade for the motor home with a contract price of $ 9,400 was not included on the sales journal of DeVille. On August 15, 1970, petitioners sold the 110 acres of property transferred to them by Mr. Weekley for a sales price of $ 10,000 to Harry L. and Loretta Harris. On December 1, 1960, Cordial Gryder obtained a $ 25,000 mortgage loan from St. Johns Community Bank (St. Johns). This loan, No. C-5229-6, remained on the books of St. Johns and had no payments applied to principal until July 17, 1968. On July 17, 1968, Cordial Gryder's loan No. C-5229-6 at St. Johns was credited with a payment in the amount of $ 20,275.04, the payment consisting of two separate credits. The first credit was by a transfer in the amount of $ 19,465.18 from the DeVille reserve account *286 No. XX1-968 at St. Johns and the balance of $ 809.86 from the reversal of a charge in that amount against the DeVille reserve account at St. Johns for payment on an installment loan on a 1965 Riviera automobile. The loan on the Riviera had been taken out by Ernest Gryder. The automobile had been sold to DeVille. The automobile was wrecked, resulting in the charge to the DeVille reserve account. This charge was protested by Cordial Gryder and the bank reversed the charge against the reserve account by crediting it to Cordial Gryder's loan No. C-5229-6. On November 13, 1968, DeVille check No. 5931 in the amount of $ 1,276.75 was applied against this same loan, No. C-5229-6, and this payment was shown on the DeVille disbursements journal as "unit payoffs" and deducted on DeVille's corporate tax return for 1968. The check bears the notation "Partial PO Ernie Gryder 65 Riv." In July 1969, loan account No. X-X229-6 in the name of Cordial Gryder was transferred to Colonial Bank and was assigned loan No. 13-074 by that bank. The following schedule shows the date and amount of payments made by DeVille with respect to the loan of Cordial Gryder at Colonial Bank, No. 13-074, after its transfer *287 to that bank from St. Johns, how the payments were shown on DeVille's distursements journal and how they were treated on DeVille's Federal income tax returns: How Shown
How Treated on
on DeVille's
DeVille's Federal
Date
Amount
Disbursements Journal
Income Tax Returns 9-10-69
$ 580.70
Genl-Notes Payable
Reduced Sales
11-04-69
290.35
Genl-Loan Pmt
Reduced Sales
11-20-69
290.35
Genl-Loan Pmt
Reduced Sales 1-20-70
580.70
Genl-Loan Pmt
Deducted 3-26-70
580.70
Genl-Loan
Deducted 5-12-70
580.70
Genl-Loan
Deducted 9-02-70
871.05
Genl-Loan
Deducted
On March 14, 1968, Robert Fitzwilliam conveyed to petitioners certain land in O'Fallon, Missouri, at the northwest corner of Old Highway 40 and Highway K for a total sales price of $ 38,000. The $ 2,000 paid as earnest money upon the negotiation of the contract for purchase of the property in O'Fallon, Missouri, was provided by withdrawal on January 31, 1968, and February 29, 1968, from the credit life insurance account No. X-X116-4 of DeVille at Colonial Bank, each withdrawal being in the amount of $ 1,000. The remaining $ 36,000 paid at the closing was by cashier's check *288 No. 7048 in the amount of $ 8,000 drawn on March 8, 1968, against DeVille's reserve account No. 1 at Colonial Bank and the proceeds of a $ 28,000 loan to Cordial Gryder by the First State Bank of Bonne Terre, loan No. 50276. Neither the $ 2,000 paid from the DeVille credit life insurance account at Colonial Bank nor the $ 8,000 paid by a withdrawal from DeVille's reserve account No. 1 were included in the income of petitioners as reported on their individual tax returns for 1968, and these amounts appeared in no way on the corporate tax return filed by DeVille for the year 1968. The following schedule shows the date and amount of payments made by DeVille in discharge of Cordial Gryder's loan No. 50276 from the First State Bank of Bonne Terre, how the payments were shown on DeVille's disbursements journal and how the payments were treated on DeVille's Federal income tax returns: How Shown
How Treated on
on DeVille's
DeVille's Federal
Date
Amount
Disbursements Journal
Income Tax Returns 4-13-68
$ 317.94
C. D. Gryder
Deducted 5-14-68
317.94
Genl-Loan
Deducted 7-25-68
635.88
C. D. Gryder
Deducted 8-26-68
635.88
Genl-Loan
Deducted
11-05-68
635.88
Genl-Loan
Deducted
12-02-68
635.88
Genl-Loan
Deducted 3-13-69
635.88
Genl-Loan Pmts
Reduced Sales 4-15-69
644.88
Genl-O'Fallon Pmts
Reduced Sales 7-02-69
635.88
Genl-Note Payable
Reduced Sales 9-14-69
635.88
Genl-Loan Pmts
Reduced Sales
10-17-69
635.88
Genl-Loan Pmts
Reduced Sales 1-06-71
1,907.64
* Not chged to acct ** 7-22-71
317.98
Genl **
*289 On August 29, 1968, petitioners purchased 500 shares of Open Road Campers stock at a price of $ 10.00 per share through their account No. XX-XX158-1-41 at the McDonnell & Company Brokerage Firm. The payment for this 500 shares of stock was by a $ 5,000 check payable to McDonnell & Company Brokerage Firm written on the credit life insurance account No. 0-1116-4 of DeVille at Colonial Bank. The check bears the notation "C. D. Gryder." The certificates of stock were issued in the names of petitioners. The $ 5,000 was not reported as income on the 1968 joint Federal income tax return of petitioners. On August 19, 1968, a debit was made to the reserve account No. 1 of DeVille at Colonial Bank, account No. X-X143-9, in the amount of $ 10,000. The proceeds of the debit were used to purchase a cashier's check dated August 19, 1969, payable to Cordial Gryder in the amount of $ 10,000. This cashier's check was endorsed by Cordial Gryder and by Tony Podorski.Mr. Podorski purchased 2,500 shares of stock of Americare Corporation *290 in the names of "Tony Podorski and Virginia L. Podorski, J.T.R.S." The certificates were issued on October 16, 1968, and were held by Mr. Podorski until the time of the trial of United States v. Cordial D. Gryder, Docket No. 75-52 CR(2), in the United States District Court for the Eastern District of Missouri in May 1975. At that trial the certificates were placed in evidence. The certificates were held by Mr. and Mrs. Podorski as nominees for Cordial Gryder. Mr. and Mrs. Podorski would have transferred the certificates to Mr. Gryder or to anyone Mr. Gryder designated had they been requested by Mr. Gryder to do so. [3] The 10,000 from the DeVille reserve account No. 1 with which the cashier's check used to pay for the 2,500 shares of Americare Corporation stock was purchased was not reported by petitioners on their joint Federal income tax return for 1968. *291 On March 11, 1968, Robert and Nancy A. Moore quitclaimed their interest in lot 108, Horse Shoe Bend, plat No. 9, to Cordial Gryder, the only consideration for the transfer being Mr. Gryder's assumption of the payments due on the purchase price of the lot. The following schedule shows the date and amount of payments made by DeVille of Mr. Gryder's obligation with respect to lot 108, Horse Shoe Bend, plat No. 9, Camden County, Missouri, how the payments were shown on DeVille's disbursements journal and how the payments were treated on DeVille's Federal income tax returns: How Charged
How Treated on
on DeVille's
DeVille's Federal
Date *
Amount
Disbursements Journal
Income Tax Returns
3-08-68
$ 211.17
License & Taxes
Not Deducted
5-23-68
180.30
Comm'n/Bird Dog
Deducted
2-28-69
928.10
Not on Journal
Not Deducted
5-26-70
153.00
Genl-Loan Pmt
Deducted
In 1970 Cordial gryder arranged to purchase from Robert Anderson, who was then president of Central Pontiac-Cadillac, *292 Inc., the assets of that business. As a deposit on the purchase price, Cordial Gryder gave Mr. Anderson a $ 5,000 check dated July 17, 1970, drawn on the DeVille credit life insurance account No. X-X116-4 at Colonial Bank. The disbursement of this $ 5,000 was not shown on the disbursements journal of DeVille for 1970 but was deducted on the corporate income tax return of DeVille for 1970 pursuant to an adjusted journal entry on October 31, 1970. Gryder Motors, Inc. was organized as a Missouri corporation on December 2, 1970, to operate the business previously operated by Central Pontiac-Cadillac, Inc. A 1970 Ford farm tractor which was purchased at retail by Cordial Gryder and kept at his residence at High Hill, Missouri, was financed by Associates Financial Services Co. under the DeVille floor plan. The following schedule shows the payments made by DeVille on the purchase price of the 1970 Ford farm tractor used by Cordial Gryder at his High Hill residence, how the payments were shown on the DeVille disbursements journal and how the payments were treated on the 1970 Federal income tax return filed by DeVille: How Shown
How Treated on
on DeVille's
DeVille's Federal
Date
Amount
Disbursements Journal
Income Tax Return 1-01-70
$ 141.25
Genl-Loan Pmt
Deducted 7-28-70
141.25
Genl-Loan
Deducted 8-28-70
141.25
Genl-Pmt
Deducted
10-02-70
141.25
Genl-Tractor Pmt
Deducted
10-28-70
141.25
Genl-Loan Pmt
Deducted
11-20-70
141.25
Genl-Tractor Pmt
Deducted
*293 Many of the utility bills for service furnished to the Orchard Drive residence and the High Hill residence of petitioners were paid by checks of DeVlle. The following schedule shows the date and amount of each such payment, the service for which the payment was made, how each such payment was described on DeVille's disbursements journal and how the payments were treated on DeVille's Federal income tax returns: How Treated
How Described on
on DeVille's
DeVille's Disbursements
Federal Income
Date
Amount
Journal
Tax Return 7-12-68
$ 13.58
Heat, Light & Power
Deducted 9-06-68
27.88
Heat, Light & Power
Deducted 9-30-68
32.80
Heat, Light & Power
Deducted
11-06-68
25.59
Heat, Light & Power
Deducted
12-27-68
102.61
Heat, Light & Power
Deducted
11-22-68
28.39
Heat, Light & Power
Deducted
12-23-68
16.24
Heat, Light & Power
Deducted 1-08-69
112.33
Heat, Light & Power
Deducted 1-29-69
132.93
Heat, Light & Power
Deducted 3-03-69
130.05
Heat, Light & Power
Deducted 4-07-69
99.15
Heat, Light & Power
Deducted 4-29-69
68.55
Heat, Light & Power
Deducted
11-10-69
53.00
Heat, Light & Power
Deducted
12-10-69
100.80
Heat, Light & Power
Deducted 1-22-69
32.66
Heat, Light & Power
Deducted 3-20-69
30.46
Heat, Light & Power
Deducted 5-15-69
50.42
Heat, Light & Power
Deducted 6-11-69
18.31
Sales
Deducted 6-10-69
38.58
Office Expense
Deducted
10-09-69
69.69
Office Expense
Deducted 9-19-69
$ 88.12
Office Expense
Deducted 2-02-70
173.72
Heat, Light & Power
Deducted 1-02-70
111.92
Heat, Light & Power
Deducted 3-11-70
133.76
Heat, Light & Power
Deducted 4-08-70
99.97
Heat, Light & Power
Deducted 5-05-70
90.91
Heat, Light & Power
Deducted 6-10-70
50.53
Heat, Light & Power
Deducted 6-29-70
81.96
Heat, Light & Power
Deducted 7-30-70
83.71
Heat, Light & Power
Deducted 9-17-70
105.65
Heat, Light & Power
Deducted
10-16-70
87.22
Heat, Light & Power
Deducted
11-05-70
43.12
Heat, Light & Power
Deducted
12-16-70
92.97
Heat, Light & Power
Deducted
*294 Service for Which
Date
Payment Made 7-12-68
Elec. Serv.,
High Hill Resid. 9-06-68
"          9-30-68
"         11-06-68
"         12-27-68
"         11-22-68
Elec. Serv.,
5 Orchard Resid.
12-23-68
"          1-08-69
Elec. Serv.,
High Hill Resid. 1-29-69
"          3-03-69
"          4-07-69
"          4-29-69
"         11-10-69
"         12-10-69
"          1-22-69
Elec. Serv.,
5 Orchard Resid. 3-20-69
"          5-15-69
"          6-11-69
"          6-10-69
Elec. Serv.,
High Hill Resid.
10-09-69
"          9-19-69
Elec. Serv.,
High Hill Resid. 2-02-70
"          1-02-70
"          3-11-70
"          4-08-70
"          5-05-70
"          6-10-70
"          6-29-70
"          7-30-70
"          9-17-70
"         10-16-70
"         11-05-70
"         12-16-70
"         *295 Cordial Gryder owned a 1963 Chris Craft Inboard boat and a 1964 Coronado Inboard boat. Part of the purchase price of each of these boats was financed by loans. The following schedule shows the date and amount of payments made by checks of DeVille on the loan obligations and insurance with respect to these two boats, how the payment was described on the disbursements journal of DeVille, how the payment was treated on the corporate income tax returns of DeVille and the loan on which the payment was made: How Treated
How Described on
on DeVille's
DeVille's Disbursements
Federal Income
Loan on Which
Date
Amount
Journal
Tax Return
Payment Made 7-28-67
$ 298.44
Genl-Loan Pmt
Not Deducted
Coronado boat loan
10-02-67
298.44
Genl-Loan Pmt
Not Deducted
Coronado boat loan
12-01-67
149.22
Genl-Boat Loan
Not Deducted
Coronado boat loan 2-14-67
275.96
Genl-Boat Pmt
ChrisCraft boat
loan 6-12-68
175.00
Genl-Ins. Premium
Deducted
Coronado boat ins. 2-01-68
298.44
Genl
Coronado boat loan 3-18-68
298.44
Genl-Loan
Not Deducted
Coronado boat loan 5-18-68
298.44
Genl-Loan Pmt
Not Deducted
Coronado boat loan 7-18-68
298.44
Genl-Loan Pmt
Not Deducted
Coronado boat loan 8-20-68
298.44
Genl-Loan Pmt
Not Deducted
Coronado boat loan
11-22-68
298.44
Genl-Loan Pmt/Boat Loan
Not Deducted
Coronado boat loan 1-21-69
447.66
Genl-Coronado Pmt
Coronado boat loan 6-27-69
298.44
Floor Plan
Not Deducted
Coronado boat loan
11-04-69
303.30
Genl-Ins. Co.
Deducted
Coronado boat ins.
loan
12-18-69
151.65
Genl-Ins.
Deducted
"            4-28-69
298.44
Genl-Loan
Reduced Sales
Coronado boat loan 3-04-70
303.30
Genl-Loan Pmt
Deducted
Coronado boat ins.
loan
4-09-70
151.65
Genl-Loan(Ins)
Deducted
"           *296 At times both business and personal friends of Cordial Gryder were permitted to use the Coronado boat or the Chris Craft boat, but the boats were the property of Mr. Gryder and not of DeVille. On September 22, 1969, DeVille paid $ 1,134 to Tony Podorski Real Estate Company for an insurance policy running from April 14, 1969, through April 14, 1972, upon property owned by petitioners in O'Fallon, Missouri. The $ 1,134 was entered on the DeVille disbursements journal and deducted by DeVille on its Federal income tax return for 1969 as interest expense. When Ms. Hoch, DeVille's bookkeeper, knew that an item was a personal expense of Cordial Gryder but was not instructed how to account for the payment by DeVille, she would place the amount in a column on DeVille's journal marked "C. D. Gryder drawing or draw account." At the end of each year the balance in this account would be dropped from DeVille's records.There was never any payment made as an offset against the C. D. Gryder draw or drawing account during the time Ms. Hoch kept books for DeVille. Mr. Gryder never requested Ms. Hoch to furnish him a total of the items charged to his drawing account for any year and never advised Ms. Hoch that he intended to repay these amounts. During the years 1967 and 1968 the total items placed in Mr. Gryder's drawing account were $ 3,181.55 and $ 10,394.91, respectively. During the year 1968 DeVille drew three $ 300 checks on separate dates in March, four such checks on separate dates in April, five such checks on separate dates in May, four such checks on separate dates in June, and one such check in July to the order of Mr. Gryder. In addition, three checks for $ 250 each and one for $ 150 were drawn in July 1968 to the order of Mr. Gryder and one check for $ 108 was drawn in May to the order of Mr. Gryder. All of these checks except the first three drawn in March were shown on the DeVille disbursements journal as "Salary." These checks were cashed, and each bore Mr. Gryder's endorsement. None of the amounts represented by these checks were deducted by DeVille on its Federal income tax for 1968 and petitioners did not report the amount represented by these checks on their joint Federal income tax return for 1968. On February 18, 1967, a check was drawn on DeVille's unrestricted reserve account No. 1, No. XX-341-5 at Citizens Bank, in the amount of $ 1,800 in *297 payment of loan No. DC5064 made to Cordial Gryder by City Bank. Cordial Gryder's loan account No. XX5064 at City Bank was credited on February 24, 1967, with the $ 1,800 payment. On July 13, 1967, a check was drawn on DeVille's unrestricted reserve account No.X-X143-9 at Colonial Bank in the amount of $ 2,050. Of the proceeds of this check, $ 2,000 was applied against loan No. DC5064 in the name of Cordial Gryder at City Bank on July 14, 1967. Neither the $ 1,800 nor the $ 2,050 were reflected on the disbursements journal of DeVille. An un-numbered check on the unrestricted DeVille reserve account No. 1, No. X-X143-9, dated December 22, 1967, in the amount of $ 400, drawn and signed by Cordial Gryder, was not reflected on the DeVille disbursements journal. Another un-numbered check to cash dated December 22, 1967, signed by Cordial Gryder, in the amount of $ 500, drawn on the DeVille credit life insurance account, No. X-X116-4, was not reflected on the DeVille disbursements journal. The amounts of these checks did not appear in any way on DeVille's Federal income tax return for the year 1967 and were not reported by petitioners as income in that year on their joint income tax *298 return. On February 25, 1969, a check on the DeVille general checking account, No. X-X120-1, in the amount of $ 500 was used to purchase an imprint permit for postal services to be used by the Citizens Committee for S. J. Webbe. All of the $ 500 except $ 160.02 was expended by the Citizens Committee for postage and the $ 160.02 was refunded to the Citizens Committee for S. J. Webbe by a Government check dated September 18, 1969. The $ 500 check was recorded on DeVille's 1969 disbursements journal in a column marked "Donation" and was deducted by DeVille on its corporate income tax return for the year 1969.
During the years 1967, 1968, 1969 and 1970, petitioners received rental income from a property they owned, which was referred to as the Natural Bridge property, in the amounts of $ 3,552, $ 3,140, $ 1,235, $ 2,750 and $ 2,985, respectively. During 1970 and 1971 petitioners received rental income from the house located on the 40 acres of property in High Hill which they purchased in 1970 in the amounts of $ 672 and $ 885.67, respectively, and in 1971 they received $ 3,600 from rental of the O'Fallon property. On their joint Federal income tax returns for the years 1967, 1968, *299 1969 and 1970 no rental receipts were reported by petitioners. In 1969 Philip Hildebrandt purchased a 1969 GMC pickup truck from DeVille. As part payment on the purchase price he received a credit of $ 1,287.16 representing charges due and owing to his business, Malibu Beach Boat Sales and Service (Malibu Beach), by Wayne Gryder in the amount of $ 861.16 and by Cordial Gryder in the amount of $ 462. The $ 1,287.16 applied against the purchase price of the truck was not taken into gross receipts on the books of DeVille. In 1970 Mr. Hildebrandt purchased a 1969 Cadillac from DeVille and received a credit on the purchase price totaling $ 2,335.94 for services rendered by his Malibu Beach business to Wayne Gryder and Cordial Gryder in the respective amounts of $ 1,023.30 and $ 1,312.64. The charges due by Wayne Gryder and Cordial Gryder to Malibu Beach were for storage and repair on boats owned by Wayne and Cordial Gryder. The credit against the purchase of the Cadillac was approved by Cordial Gryder. In 1968, $ 200 due to DeVille for services rendered to Malibu Beach was discharged by a credit against Cordial Gryder's obligation to Malibu Beach, and in 1970 a $ 30 amount due DeVille *300 for services rendered to Malibu Beach was discharged by a credit against an obligation of Cordial Gryder to Malibu Beach. In 1971 Cordial Gryder requested Tony Podorski to arrange to have a survey made on a piece of property in which Mr. Gryder was interested. Mr. Podorski arranged to have R. L. Elgin and Associates do the survey. The charge for the survey was $ 1,871.30 and Mr. Podorski was reimbursed for the survey by check No. 2571 drawn on the account of Gryder Motors. During the years 1970 and 1971 petitioners received interest from Irondale Bank in the amounts of $ 195 and $ 214.50, respectively, on a certificate of deposit they owned at Irondale Bank. This interest income was not reported on the joint Federal income tax returns of petitioners for the years 1970 and 1971. Under date of September 17, 1971, Mr. Gryder received the following inquiry addressed to him at Gryder Motors, Rolla, Missouri: Our auditors * * * are now engaged in their annual examination of our accounts at August 31, 1971. Our records indicate you are holding a note(s) in the amount of $ 63,875.00 due bearing interest at the rate of 8%, interest being paid through approx Oct 20, 1971 *301 . Please confirm the above directly to our auditors by signing in the proper place below. A self-addressed, stamped envelope is enclosed for your convenience. Mr. Gryder returned the above-quoted inquiry with the statement "The above is correct" checked by letter dated October 15, 1971, which read as follows: This is to confirm that as of August 31, 1971, Gryder Motors, Inc. was indebted to me in the sum of $ 63,875 (Sixty-Three Thousand Eight hundred and seventy-five dollars) on two notes payable, maturing September 1, 1972. As of that date I subordinated the total amount to General Motors Acceptance Corporation per the Subordination Agreement, copy of which has been furnished your [sic] here-to-fore. In 1971 Cordial Gryder received $ 4,700 of interest income from Gryder Motors, none of which was reported on the Gryder's joint Federal income tax return for 1971.
Prior to her marriage to Cardial Gryder, Pansy Gryder had been employed at American Telephone and Telegraph Company (AT&T). While employed there she purchased stock in that company.During all of the years 1967 through 1971 Pansy Gryder received quarterly checks ranging from $ 30 to $ 40 as dividends on *302 this stock. When she received these checks she either cashed them or deposited them to her bank account. These dividends were not reported or disclosed on the joint Federal income tax returns for the calendar years 1967 through 1971 filed by petitioners. The purchase price of the Orchard Drive property in Florissant, Missouri, which Cordial Gryder acquired in January 1960 was $ 22,750. Thereafter certain improvements were made on the house, including the installation of an intercom system, the conversion of the garage into a recreation room, putting in sliding glass doors to the patio and making improvements to the swimming pool. In May 1969 petitioners sold the Orchard Drive property to Paul and Kathryn DeWitt. The sales price was $ 29,500. Petitioners paid a commission of $ 1,770 on the sale and a $ 4.50 fee for release of a deed of trust on the property. Petitioners, on their joint Federal income tax return for the year 1969, reported no gain on the sale of the Orchard Drive property. A reconstruction of gross receipts of DeVille made by an Internal Revenue agent for each of the years 1967 through 1970 by use of a bank deposits method discloses the following understatement *303 of gross receipts: 1967
$ 39,209.79
1968
50,997.10
1969
3,035.43
1970
17,435.79
The personal loans to Cordial Gryder at Colonial Bank were in his own name. Loans made to DeVille, which were negotiated on behalf of DeVille by Cordial Gryder, were in the name of DeVille. Some of the loans of DeVille were guaranteed by Mr. Gryder and at times by Mr. and Mrs. Gryder. During the period 1967 through 1975 the bank never collected anything from petitioners on any personal guarantee of a DeVille liability. During the years 1967 and 1968 certain rental collections on property owned by petitioners were made by St. Johns bank. The ordinary custom at St. Johns is to send the person for whom rent is collected a monthly statement, whether or not the amount of rent collected is applied to a loan of that individual. At times Cordial Gryder would direct representatives of St. Johns as to which account or loan a payment should be applied. It is the custom of St. Johns to apply the proceeds to the loan designated when a check is received showing a certain loan number. During the years here at issue all corporate obligations of DeVille to St. Johns were paid and St. Johns *304 never foreclosed on any property put up as collateral by Mr. Gryder in quaranteeing loans of DeVille. Upon satisfaction of a particular corporate obligation, any collateral personally put up by Cordial Gryder to secure that obligation was released or returned to him. John Mooney informed Cordial Gryder that Ed Davis would be working with Mooney on the rewiring of the residence at High Hill.When Ed Davis received the check for his work at High Hill, John Mooney advised him that the statement on the check that it was for work done on Lot 140 was a "tax thing." Petitioners were at the High Hill residence at various times when Ed Davis was doing electrical wiring work there. On delivery of checks by Cordial Gryder to John Mooney for electrical work Mr. Mooney did on the High Hill residence, Mr. Gryder told Mr. Mooney that if he were questioned about the check he should say that the work was done for DeVille on Lot 140. When Mr. Mooney came to testify in the criminal case of United States v. Cordial D. Gryder, supra, he met Mr. Gryder in the hall of the United States Courthouse. At that time Mr. Gryder told Mr. Mooney "to remember that he [Mooney] had done the work on the *305 lot at 140." Mr. Mooney replied that this was not a fact--that the work he had done had been out at High Hill. During the time John Mooney and Ed Davis were working on the High Hill property, they would at times sleep on cots in the house and also at times Bob Thomure would stay at the house. During the time Mr. Mooney and Mr. Davis were working on the High Hill property, Mr. Gryder told them that he was the owner of that property. When Mr. Hildebrandt received a letter from Marjorie Hoch at DeVille stating that the offset of "Buck's" (Cordial Gryder) and "Wayne's" (Wayne Gryder) charges due to Malibu Beach against the purchase of a 1969 Cadillac had not been authorized by Buck, Mr. Hildebrandt called Cordial Gryder and was told by Cordial Gryder that Mr. Gryder would take care of it. Marvin Blum and his CPA firm, Blum, Rones and Co., were retained by DeVille to summarize records which were provided to them consisting of the disbursements, sales and receipts journals and to prepare tax returns from those records. They were not engaged to and did not prepare audited balance sheets of DeVille except on one occasion, which was a balance sheet as of October 31, 1970. It *306 was the custom of Mr. Blum and his CPA firm in the preparation of corporate income tax returns from records furnished by clients which had not been audited by the firm to report the items as shown on the books and records furnished by an employee or officer of the corporation. If Mr. Blum or members of his firm were aware that an item shown as paid on a corporate record represented a personal expense of a shareholder or officer, such item would not have been deducted as an expense of the corporation in the preparation of the corporate tax return nor would any such item have been amortized and an amortization deduction taken on the return. Mr. Blum first became aware of the existence of the DeVille credit life insurance account during the preparation of the 1969 corporate income tax return of DeVille in the year 1970. He was preparing the 1969 adjusting journal entries when he discovered the existence of this account.Since Mr. Blum was not aware of the existence of this account, no effect was given to the account in preparing the corporate tax return for 1968. Mr. Blum was also unaware of the DeVille reserve account No. 1 at Colonial Bank (Acct. No. X-X143-9) when he prepared *307 the DeVille corporate tax return for the year 1968. The preparation of the corporate tax returns for DeVille for its years 1967, 1968, 1969 and 1970 was completed by Mr. Blum and his accounting firm on December 10, 1968, December 15, 1969, February 25, 1971 and September 13, 1971, respectively. The individual Federal income tax returns of petitioners for the years 1967, 1968, 1969, 1970 and 1971 were completed by Mr. Blum on April 14, 1969, April 14, 1969, April 8, 1970, April 10, 1971 and February 1, 1973, respectively. It was Mr. Blum's practice to report on an individual's income tax return all of that individual's income which was disclosed to him by that individual. Mr. Blum was first informed that petitioners owned rental property at the time he was preparing their joint Federal income tax return for the year 1971. When Mr. Blum learned that petitioners had rental income, he discussed with Cordial Gryder the possibility of filing amended returns for prior years but was told by Mr. Gryder that there was no need to file such amended returns since the rental properties either lost money or broke even in prior years. Ms. Hoch was not familiar with the reserve accounts maintained *308 by DeVille. She entered checks on the regular checking account of DeVille in the disbursements journal under one of the classes of items set up in the journal. No separate record was maintained of disbursements from the credit life insurance account. When in doubt as to where to enter an item, Ms. Hoch would inquire of Cordial Gryder and enter the item in accordance with his direction. Except for routine and repetitious items, Ms. Hoch only drew checks on DeVille's account at someone's direction. Many of the checks drawn by Ms. Hoch were at the direction of Cordial Gryder. Cordial Gryder signed all of the checks drawn on the DeVille account. After her marriage to Cordial Gryder, Pansy Gryder opened a checking account at Citizens Bank in her maiden name at the suggestion of Cordial Gryder. She wrote checks on this account but for household money she would sometimes cash one of Cordial Gryder's payroll checks from DeVille. After Cordial and Pansy Gryder opened a joint account at Jonesburg State Bank, Pansy Gryder endorsed most of Cordial Gryder's payroll checks and deposited them to that account. She signed most of the checks written on that account. Generally, Pansy Gryder *309 collected the rent from the house on the 40-acre parcel at High Hill and either deposited the check for the rent collected in the Jonesburg State Bank account or gave the checks for the rent to Cordial Gryder to cash. In 1970, Pansy Gryder gave the tenants on the 40-acre property permission to pay their rent in two monthly installments. Pansy Gryder kept no records concerning the collection of rent. Pansy Gryder knew that rent was received on the Natural Bridge property and the O'Fallon property as well as the High Hill property. Pansy Gryder wrote some checks for mortgage payments on the 40-acre rental property at High Hill on the Jonesburg State Bank account after that account was opened. Pansy Gryder was aware of the renovations being made on the High Hill property and of the source of many of the supplies used at that property. At the time of the trial of this case, Pansy Gryder was the owner of both the 40-acre and the 57-acre parcel of property at High Hill, Missouri. She still owned approximately one-half of the O'Fallon property, the other half of that property having been condemned by the Missouri State Highway Department in 1978. Pansy Gryder had received between *310 $ 70,000 and $ 78,000 from the State of Missouri for the portion of the O'Fallon property condemned in 1978. At the time of the trial of this case, Pansy Gryder owned the Fredericktown, Missouri, property which Cordial Gryder had acquired from Eldred McGraw in 1967, and the Woodland Park Harbor property which had been acquired by Cordial Gryder from Mr. Frey and Mr. Beights. Also, at the time of the trial of this case, Pansy Gryder owned the Lake of the Ozarks property, sometimes referred to as Horseshoe Bend, which had been acquired by Mr. Gryder from Robert Moore. All of the real property owned by Cordial Gryder at the time of his death, except one parcel, was held in the joint names of Pansy and Cordial Gryder. After Cordial Gryder died in 1975, Pansy Gryder took over the ownership and management of Gryder Motors and was operating this business at the time of the trial of this case. After Cordial Gryder's death, Pansy Gryder also became the owner of the Coronado boat and the three tractors which had been owned by Cordial Gryder. Under the Last Will and Testament of Cordial Gryder, Pansy Gryder was his sole legatee and devisee and as such received all the property he owned *311 at the time of his death.
On his personal financial statement as of each of the dates October 31, 1966, July 31, 1968, and December 31, 1968, which were signed by Cordial Gryder, he listed loans receivable of only $ 2,600 and on financial statements signed later running through September 10, 1971, listed no loans receivable. On various of these financial statements Cordial Gryder listed the Natural Bridge property, the High Hill 57-acre property, the High Hill 40-acre property and the O'Fallon lot as personal assets. On an application for a GMC truck selling agreement dated August 10, 1967, Cordial Gryder stated that he had $ 18,000 annually of income from the rental of property, and on a subsequent similar application dated December 4, 1970, stated that he had annual income from the rental of property totaling $ 8,400. DeVille never owned in its own name any real property. Its principal asset was its inventory which was incumbered to almost its complete value by a floor plan for financing vehicles purchased. The principal bank account of DeVille at times had a negative balance.The following schedule is a computation of the net worth of DeVille as of the dates indicated based *312 on the income as reported on its returns for 1965 and 1966, the capital stock as shown on its returns, the income for 1967 through 1970 as computed in the notice of deficiency, the income tax and additions to tax as determined in the notice of deficiency for the years 1967 through 1970 and the distributions to Cordial Gryder for the years 1967 through 1970 as determined in the notice of deficiency: [4]
1965
1966
1967
Retained Earnings
Balance January 1
$ (1,889)
$ (7,567)
Net Income
(1,889)
(5,678)
73,810 Deduct: Federal Income Tax
$ 25,297
Addition to Tax Under
Sec. 6653(b)
(25,297)
Total
$ (1,889)
$ (7,567)
$ 40,946 Dividend to Cordial
D. Gryder
(15,543)
Miscellaneous Deductions *
Balance December 31
$ (1,889)
$ (7,567)
$ 25,403 Capital Stock
500 500 500 Less: Distribution
Other Distributions **
Net Worth
$ (1,389)
$ (7,067)
$ 25,903 *313 1968
1969
Retained Earnings
Balance January 1
$ 25,403 $ ( 916)
Net income
80,832 37,922 Deduct: Federal Income
Tax
$ 35,529 $ 12,873 Addition to Tax Under
Sec. 6653(b)
12,649 17,765 (48,178)
Total
$ 58,057 Dividend to Cordial
Divident to Cordial
58,057 6,368 Miscellaneous
Deductions *
916 180 (58,973)
Balance December 31
$ ( 916)
$ ( 180)
Capital Stock
500 Less: Distribution
( 500)
Other Distributions **
(64,355)
(64,355)
( 7,425)
(71,780)
Net Worth
$ (65,271)
$ (71,960)
1970
Retained Earnings
Balance January 1
$ ( 180)
Net Income
92,770 Deduct: Federal Income Tax
$ 38,981
Addition to Tax Under
Sec. 6653(b)
(38,981)
Total
$ 53,609 Dividend to Cordial D. Gryder
33,339
Miscellaneous Deductions *
125
33,464 Balance December 31
$ 20,145 Capital Stock
Less: Distribution
Other Distributions **
(71,780)
Net Worth
$ (51,635)
*314 The certified public accountant engaged by Gryder Motors had discussions with Cordial Gryder as well as others concerning the details, terms and interest rates on loans to Gryder Motors. During 1971 the total of the payroll and bonus checks issued to Cordial Gryder by Gryder Motors was $ 20,168.16. This amount is in excess of the amount reported on the W-2 form issued to Cordial Gryder by Gryder Motors in 1971. Petitioners Cordial and Pansy Gryder reported the following amounts of income on their Federal income tax returns for the years indicated: 1967
$ 7,800
1968
7,800
1969
13,000
1970
16,450
1971
30,190
The income reported for the years 1967, 1968, 1969 and 1970 was all from salary paid to Cordial Gryder by DeVille. No other items of income were reported for those years. For the year 1971, salaries and wages were reported by Cordial Gryder in the amount of $ 27,200. Attached to the return was a W-2 form from DeVille showing salaries or wages of $ 9,000 and a W-2 form from Gryder Motors showing salaries or wages paid to Cordial Gryder of $ 18,200. The balance of the $ 2,990 reported on this return consisted of $ 390 net income from rental properties *315 and $ 2,600 listed as miscellaneous income from Gryder Motors. During the years 1970 and 1971, Cordial and Pansy Gryder received interest income in the representative amounts of $ 195 and $214.50 from Irondale Bank on certificates of deposit. The checks for the interest on these certificates of deposit were deposited by Pansy Gryder in their joint checking account at Jonesburg State Bank. ULTIMATE FINDINGS OF FACT 1. The Federal income tax returns filed by Cordial and Pansy Gryder for each of the years 1967, 1968, 1969, 1970 and 1971 were false and fraudulent with intent to evade tax. 2.The Federal income tax returns filed by DeVille for each of the years 1967, 1968, 1969 and 1970 were false and fraudulent with intent to evade tax. 3. There is an underpayment of tax by Cordial and Pansy Gryder for each of the calendar years 1967, 1968, 1969, 1970 and 1971, and a part of the underpayment for each of these years is due to the fraud of Cordial Gryder. 4. Respondent has failed to show by clear and convincing evidence that any part of the underpayment of tax for any of the years 1967, 1968, 1969, 1970 and 1971 was due to the personal fraud of Pansy Gryder. 5.Pansy Gryder *316 reasonably should have known that there were omissions of income from the Federal income tax returns which she filed jointly with Cordial Gryder for each of the years 1967, 1968, 1969, 1970 and 1971. 6. Pansy Gryder significantly benefited directly from the items omitted from the gross income on the joint income tax returns filed by Cordial and Pansy Gryder for the years 1967, 1968, 1969 and 1970. 7. There is an underpayment of tax in each of the years 1967, 1968, 1969 and 1970 by DeVille, a part of which underpayment is due to fraud. 8. DeVille was rendered insolvent beginning in the year 1968 by the distributions made without consideration to Cordial Gryder during the years 1967, 1968, 1969 and 1970. OPINION Each of the parties in this case argued at length in the briefs as to the correctness of the ruling made by the Court at the trial with respect to the acceptance of secondary evidence. Therefore, we will discuss in more detail than at the trial the basis of that ruling before reaching any of the substantive issues in this case. Respondent consumed several days of trial time with the testimony of witnesses explaining the reason for the unavailability of the *317 originals of certain records. Without going into detail with respect to the testimony of each witness, we conclude that this voluminous testimony establishes the following facts. At the conclusion of the criminal trial of United States v. Cordial D. Gryder, supra, which was held from May 5, 1975, through June 2, 1975, may of the original records of Cordial Gryder and of DeVille were exhibits in that case and other of those records were in the possession of the United States Attorney. When the criminal case was appealed to the Eighth Circuit, the documents which had been received in evidence were sent to the Circuit Court. When the case was remanded to the District Court with directions to enter a verdict of acquittal because of the death of Mr. Gryder, these exhibits were returned to the United States Attorney. After receiving the exhibits the United States Attorney transferred to the Intelligence Division of the Internal Revenue Service all of the original records of DeVille and of Mr. Gryder which had at any time been in the possession of the United States Attorney, including both those which had been introduced in evidence in the criminal case and those which had not. *318 These documents were contained in a large number of boxes which were placed in the security storage room of the Criminal Investigation Division of the Internal Revenue Service. When an attorney in respondent's St. Louis office commenced work on the instant case, he and the revenue agent who was assisting him were given access to these boxes. At that time the revenue agent saw in these boxes the DeVille disbursements, sales and receipts journals for 1968, 1969 and 1970, canceled checks and check stubs of DeVille, third party documents, affidavits, memoranda of interviews, bank statements, agents' work papers, loan ledgers and certain papers concerning Gryder Motors. The revenue agent, at the direction of the attorney handling the case for respondent, withdrew all the documents which he and the attorney considered to relate to the fraud issues involved in the above-entitled case. These documents were retained in the office of the attorney for respondent from the time they were withdrawn until March 1979 after the above-entitled case had been continued from the March 1979 St. Louis trial calendar. After the case was continued, respondent's attorney returned approximately two-thirds *319 of the documents which had been withdrawn from the boxes in the Criminal Investigation Division storeroom to that storeroom. He retained the balance of the documents in his office. In October 1979 the attorney who had been handling this case turned over the documents which were in his office to the attorneys presently representing respondent. After the attorneys presently handling the case reviewed the files that had been turned over to them, they discovered that these files did not include the 1968, 1969 and 1970 disbursements, sales and receipts journals of DeVille, the check stub book of DeVille, some signature cards, some financial statements which Cordial Gryder had submitted to Associates Financial Service Co. and Colonial Bank, some materials related to Gryder Motors, the work papers of the C.P.A. for Gryder Motors, a number of bank statements and deposit slips and most of the supporting schedules and work papers of the revenue agents and special agents which had been prepared in connection with the criminal case. When inquiry was made with respect to these files late in 1979 or early in 1980, the attorneys were informed that in accordance with a reorganization of the file *320 room, the files had been transferred from the Criminal Investigation Division storeroom to a central file storeroom which was responsible for the storage and maintenance of all Internal Revenue Service files in the St. Louis region.When further inquiry was made, respondent's attorneys were informed that the person in charge of the central file room, upon learning that the special agent's report had been retired to the Federal Records Center, directed that all the boxes containing material with respect to Mr. Gryder's tax liability for the years 1967 through 1971, the tax liability of DeVille for the years 1967 through 1970, and the tax liability of Gryder be hauled out and burned. The required procedure before destruction of a file in the St. Louis region was that the Appeals Office of that region, the Examination Division of that region and the District Counsel's Office of that region be notified of the proposal to destroy the documents. If any objections were made by a responsible person from any of these offices to the destruction of a file, that file would not be destroyed. The person in charge of the central file storeroom to which the Gryder and DeVille files had been sent *321 in late 1979 was unaware of the procedure required to be followed before a file was destroyed. She addressed a memorandum to the chief of the Criminal Investigation Division requesting authority to destroy the work papers and other documents contained in the boxes stored in the central file storeroom she supervised which were marked with the name of either DeVille or Cordial Gryder. By happenstance, the chief of the division was one leave the day the memorandum requesting authority to destroy the files was received and a secretary returned to the person in charge of the central file room the memorandum requesting permission to destroy the records with the statement that the destruction was approved by the assistant chief of the Criminal Investigation Division. Shortly thereafter the records were hauled away and on December 12, 1979, were burned. Many of the records contained in these boxes were copies of bank records and other items. Respondent's attorneys called various bank officials and had the bank records produced and copies of those records were received in evidence as records kept in the normal course of business by banks. A thorough search was made of all respondent's offices *322 in the St. Louis region and the offices of the United States Attorney in St. Louis with the result that some of the other original records not turned over to the attorneys representing respondent in this case were discovered. Many of the work papers of the agents were reconstructed from evidence available to respondent and introduced at the trial of this case. However, the disbursements, sales and receipts journals of DeVille for the years 1968, 1969 and 1970 were not located, the originals of certain canceled checks were not located and the original check stub book was not located, as well as certain other documents. Copies of many of these documents were located in the exhibits which had been introduced at the criminal trial and copies of other documents were located by various witnesses who testified in this case. Much of the secondary evidence received at the trial of this case were these documents.The balance of the secondary evidence received with respect to the records of DeVille was the transcript of testimony at the criminal trial. At that trial witnesses had read into the record information from DeVille's various journals. The same witnesses were called to testify at the *323 trial of the instant case, but were unable to remember the figures to which they had testified in the criminal trial when they had the records before them. Each of these witnesses testified that he or she had truthfully testified at the criminal trial.These transcripts were received as secondary evidence of the contents of the records of DeVille.
Rule 1004 of the Federal Rules of Evidence, which governs the admissibility of evidence by this Court, provides as follows: Rule 1004. Admissibility of Other Evidence of Contents The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if-- (1) Originals lost or destroyed.--All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or (2) Original not obtainable.--No original can be obtained by any available judicial process or procedure; * * * As was stated by the Court at the trial, we conclude that originals of the DeVille journals for the years 1968, 1969 and 1970, certain canceled checks and check stubs, bank statements *324 and loan ledgers which were in he boxes in the central files storeroom of the Internal Revenue Service have been destroyed and that these documents were not destroyed in bad faith by agents of respondent but merely through inadvertence or negligence. Since we find from the evidence offered at the trial with respect to the destruction of records that the destruction of the DeVille and Gryder original records by respondent's agents was not in bad faith, we conclude that the ruling at the trial receiving in evidence the secondary evidence of these records was proper. For this reason we included in our findings of fact some findings based on this secondary evidence. It should, however, be pointed out that the evidence received at the trial of this case, other than the secondary evidence referred to above, was sufficient to establish that the tax returns of Cordial and Pansy Gryder for each of the years 1967, 1968, 1969, 1970 and 1971 were false and fraudulent due to the fraud of Cordial Gryder. The basis of this conclusion will be discussed hereinafter in the discussion of the substantive issues in this case. Therefore, the admission of the secondary evidence has little, if any, bearing *325 on our conclusion with respect to the case insofar as it involves the tax liabilities of Cordial and Pansy Gryder for the years 1967, 1968, 1969, 1970 and 1971. There is a substantial amount of evidence other than the secondary evidence supporting the conclusion that the returns of DeVille for each of the years 1967, 1968, 1969 and 1970 were false and fraudulent. The evidence that is missing with respect to DeVille, without consideration of the secondary evidence, is how some of the payments on behalf of Cordial Gryder by DeVille were shown on the books of DeVille and treated on DeVille's tax returns for each of the years here in issue. The tax returns of DeVille are in evidence and there is some evidence in the record, aside from the secondary evidence, as to the handling of personal liabilities of Cordial Gryder paid by DeVille in computing DeVille's taxable income on its returns. However, we consider it unnecessary to determine whether this evidence alone would be clear and convincing evidence of fraud on the part of DeVille since we conclude that our ruling at the trial receiving secondary evidence with respect to the contents of the documents which had been destroyed was *326 proper. The substantive issues in this case are primarily factual. From the facts in this case it is clear that the returns of Cordial and Pansy Gryder for each of the years 1967 through 1970 were false and fraudulent with intent to evade tax. For this reason the assessment and collection of deficiencies is not barred by the statute of limitations for any of the years here in issue (section 6501(c)(1)). [5] It is therefore unnecessary for us to determine whether, in accordance with respondent's alternative position, certain of the years would be open under section 6501(e). The evidence shows that the only income reported by Cordial and Pansy Gryder for each of the years 1967 through 1970 was the salary received by Cordial Gryder from DeVille, and for *327 the year 1971 only a small amount of income was reported other than the salary received by Cordial Gryder from DeVille and Gryder Motors. The record is clear that there were numerous payments made through checks from DeVille for land purchased as the personal property of petitioners in each of the years here in issue. The record is also clear that there were payments of numerous personal bills of petitioners by checks of DeVille and that all these payments were made at Cordial Gryder's direction. A large portion of the payments made for petitioners by DeVille were deducted by DeVille on its tax returns as business expenses of DeVille. The total payments on properties owned by petitioners and personal bills of petitioners made by DeVille were approximately $ 15,000 in 1967, approximately $ 122,000 in 1968, approximately $ 12,000 in 1969 and approximately $ 32,000 in 1970. Also, the record shows that in numerous instances property was transferred to petitioners which should have been transferred to DeVille since the property was part payment for vehicles sold by DeVille to the person making the transfer of the property. In a number of instances credit on vehicles sold by DeVille *328 was given to persons to whom Cordial Gryder was indebted in discharge of his indebtedness. The value of such property and the amounts of such payments were not included in DeVille's gross receipts.The record also shows that Cordial Gryder owned 98 percent of the stock of DeVille and was the officer of DeVille who had the final say as to actions taken by DeVille. The record shows that Cordial Gryder was a man of business experience and it is therefore clear that he knew that any amount paid by DeVille in discharge of his personal obligations was income to him and that such payments were not properly deductible as business expenses by DeVille.%it is also clear that Mr. Gryder knew that the value of property credited on the purchase price of a vehicle sold to the transferor by DeVille should have been included in DeVille's income. The evidence in this regard is clear and convincing with respect to each of the years 1967 through 1970. Mr. Gryder himself admitted in his testimony that payments of certain of his personal expenses were made by DeVille in each of these years. [6] He attempted to explain these amounts by saying that he had lent money to DeVille and that these payments *329 were charged against repayment of those loans. He was unable to account for the amounts of the loans, explaining that his records had been lost. He did testify that he had lent $ 45,000 sometime prior to the years here in issue to DeVille and that a $ 25,000 loan on property known as the Natural Bridge property was a loan to DeVille since DeVille was the equitable owner of that property. However, on financial statements he signed, the largest amount of loans receivable ever shown was $ 2,600. When Mr. Gryder was shown the financial statement which he signed under date of September 29, 1967, which statement was as of October 31, 1966, and was questioned as to why under loans receivable only $ 2,600 was shown, he answered that he could not explain why the $ 45,000 loan was not shown because he did not prepare the statement. However, he admitted that it was his financial statement which he had signed representing that all his assets were shown. It was also called to Mr. Gryder's attention that on this same financial statement the Natural Bridge property which was stated to have a market value of $ 35,000 was listed as one of his personal assets. Again he had no explanation of why *330 this was shown as a personal asset of his if, as he stated, the property belonged to DeVille. During the course of the criminal trial he was shown other financial statements showing his assets as of 1967, 1968, 1969 and 1970 which he had signed on various dates from 1968 through 1970, none of which showed any loans receivable in excess of the $ 2,600 and all of which listed the Natural Bridge property as his personal asset. Some of these same financial statements were introduced as exhibits in the instant case. The record, in our view, is clear that the payments of personal liabilities of Mr. Gryder by DeVille were not as offsets of any loans he had made to DeVille and that Mr. Gryder knew this. The failure to report the admitted amount of payments made by DeVille of Mr. Gryder's personal obligations is sufficient to establish fraud with respect to these years since the record shows that these payments were made at the direction of Mr. Gryder and he knew they *331 were being made and should be treated as income to him. The explanations which Mr. Gryder gave of items other than the ones he admitted to be payments of his personal expenses are contradicted by other oral and documentary evidence. Mr. Gryder attempted to justify many of the payments made with respect to his personal residence at High Hill on the basis that this property was to be used as an entertainment facility for DeVille. There is some evidence in the record that on some occasions individuals who did business with DeVille came out and fished or hunted at High Hill. This evidence, however, in no way justifies the payments on the purchase price of the property and for the remodeling of the house at High Hill as expenses of DeVille. The property was owned by petitioners in their joint names and constituted their principal place of residence. Petitioners attempt to justify the payments with respect to the boats made by DeVille by Mr. Gryder's testimony that it was intended that the boats belong to the corporation to be used as entertainment facilities. The owner of the marina where the boats were kept testified that the boats belonged to Mr. Gryder. The testimony shows *332 that all but one of the properties on which payments were made by DeVille or which Mr. Gryder had transferred to him when the value of the property was credited as part of the purchase price of a vehicle by DeVille, were in the joint names of petitioners. The record is so clear that the joint return of Cordial and Pansy Gryder for each of the years 1967 through 1970 was false and fraudulent with intent to evade tax that no further discussion is warranted. The record shows that Mr. Gryder was the responsible officer of DeVille and that he directed the business activities of DeVille. The fact that he had DeVille pay his personal obligations, including personal purposes of property, and directed that the amounts of such payments be deducted on DeVille's books as business expenses, is clear evidence of the fraudulence of the returns of DeVille for the years 1967 through 1970. The 1967 return of DeVille was signed by Mr. gryder as president of the corporation, and the 1968 return was signed by him as the manager of of DeVille. Although the 1969 and 1970 returns of DeVille were signed by Wayne Gryder as secretary-treasurer of DeVille, the record is clear that the direction to handle *333 the books in such a way that DeVille's income would be grossly underreported was given by Cordial Gryder. The record shows that DeVille's books were false and that the false entries on these books were carried forward into its returns. We therefore conclude that the evidence is clear and convincing that DeVille's returns for 1967, 1968, 1969 and 1970 were false and fraudulent. On the basis of the evidence in this case, we conclude that the assessment of deficiencies against Cordial and Pansy Gryder and against DeVille for the years 1967, 1968, 1969 and 1970 is not barred by the statute of limitations. It is clear from the record in this case that there is an underpayment of tax by Cordial and Pansy Gryder for each of the years 1967 through 1970 and an underpayment of tax by DeVille for each of the years 1967 through 1970. For the reasons we discussed above, it is equally clear that a part of the underpayment of tax by Cordial Gryder in each of the years 1967 through 1970 and a part of the underpayment of tax by DeVille in each of these years was due to fraud so that respondent properly determined the additions to tax under section 6653(b) against them. However, the record does *334 not contain clear and convincing evidence that a part of the underpayment of tax by Cordial and Pansy Gryder for each of the years 1967 through 1970 was due to the fraud of Pansy Gryder. Section 6653(b)[7] provides that if any part of an underpayment of tax required to be shown on the return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. This section further provides that in the case of a joint return under section 6013 "this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse." *335 The record here shows that the unreported AT&T dividends were with respect to stock initially purchased by Pansy Gryder and that she was aware of the interest from the certificates of deposit from the Irondale Bank. The record also shows that she collected the rentals from the house on the 40 acres of the High Hill property. However, the record shows that Pansy Gryder did not examine the tax returns she filed with Cordial Gryder to ascertain if these amounts were reported.The record shows no knowledge by Pansy Gryder of the amounts paid by DeVille for the Gryders' personal expenses and on property they purchased. In fact, the record is reasonably clear that she left all business arrangements to her husband. She testified that when he brought the returns for her to sign, she signed them without reviewing them, relying on her husband to properly report their income. While this may have been gross negligence on her part, it does not establish fraud. We therefore conclude that respondent has failed to prove by clear and convincing evidence any fraud on the part of Pansy Gryder. This fact, however, does not mean that the statute of limitations bars the collection from Pansy Gryder *336 of the tax due with respect to her joint returns with Cordial Gryder for each of the years 1967 through 1970. Because of fraud on the part of Cordial Gryder, the joint returns of Cordial and Pansy Gryder were false and fraudulent and therefore the collection of the tax from Pansy Gryder is not barred by the statute of limitations. Pendola v. Commissioner, 50 T.C. 509, 521 (1968), and cases there cited. See also Rodney v. Commissioner, 53 T.C. 287, 309 (1969). Therefore, unless petitioner Pansy Gryder is an innocent spouse within the meaning of section 6013(e), which will be hereafter discussed, she is liable for any tax due with respect to the years 1967 through 1970 on the joint returns she filed with her husband Cordial Gryder.
Respondent also determined an addition to tax for fraud with respect to the income tax return of petitioners for the calendar year 1971. This return was not filed until 1973. Although respondent determined that the rental income shown on the return was understated, there was some rental income reported. The other major adjustments made to the income reported on this return were the interest on the Irondale Bank certificate *337 of deposit of $ 214.50 and an interest payment from Gryder Motors, which was in operation in the year 1971, to Cordial Gryder in the amount of $ 4,700.Also, respondent determined payments by DeVille of a loan of petitioners at the First State Bank at Bonne Terre in the amount of $ 1,907.64 on January 6, 1971, and in the amount of $ 317.98 on July 22, 1971. The record shows that a check of DeVille's dated January 6, 1971, drawn to the Federal Deposit Insurance Corp. for $ 1,907.64 and signed by Cordial Gryder was applied to the Gryder's loan at the First State Bank of Bonne Terre. The original entry on the disbursements journal was "Bonne Terre" which was crossed out and replaced with the entry "FDIC." The second check dated July 22, 1971, in the amount of $ 317.98 was drawn on the DeVille account to the First State Bank of Bonne Terre and signed by Cordial Gryder.This check was applied to the personal loan of the Gryders at the First State Bank of Bonne Terre. The record shows that on March 14, 1968, petitioners borrowed $ 28,000 from the First State Bank of Bonne Terre secured by a first deed of trust on the O'Fallon property. Payments were made on the loan secured by this property *338 by DeVille beginning in 1968. The record shows that sometime prior to January 1, 1971, the First State Bank of Bonne Terre was closed and its assets and liabilities purchased by the Federal Deposit Insurance Corporation. The DeVille check dated January 6, 1971, in the amount of $ 1,907.64, made payable to the Federal Deposit Insurance Corporation was applied to the principal and interest of petitioners' personal loan at the First State Bank of Bonne Terre. The July 22, 1971, DeVille check in the amount of $ 317.98 was similarly applied. Had these small amounts of payments of personal liabilities of Cordial and Pansy Gryder by DeVille been the only such payments shown of items not reported on their personal joint returns, we would consider the evidence of fraud with respect to the year 1971 less clear.However, these payments followed the pattern of a series of similar payments extending over a period of four years. The record shows that the payments were made with DeVille funds by Cordial Gryder with full knowledge that he was using the funds of his 98 percent owned corporation for his own personal use without including the disbursements in his reported income. Considering the *339 record as a whole, we conclude that the failure of Cordial Gryder to report as income on his 1971 tax return the $ 2,225.62 paid for his benefit by DeVille is clear and convincing evidence that his joint return with Pansy Gryder for the year 1971 was false and fraudulent and that this false return was due to the fraud of Cordial Gryder. Again there is no showing that Pansy Gryder was knowledgeable that these payments were made by DeVille on behalf of the Gryders. Although the record does show that Pansy Gryder knew of the $ 214.50 interest on the certificates of deposit which she and Cordial Gryder owned at the Irondale Bank, it does not show that she actually was aware that this amount was not reported on their 1971 tax return. We therefore conclude that for the year 1971 respondent has shown by clear and convincing evidence fraud on the part of Cordial Gryder, but has failed to show fraud on the part of Pansy Gryder. There were many explanations given in this record of adjustments which petitioners claimed were improper. Primarily these adjustments dealt with amounts which petitioners contend were entertainment business expenses. However, the record is totally deficient to establish *340 under the rules of section 274 that such amounts were in fact entertainment expenses. There is also testimony in the record with respect to checks drawn to the order of Cordial Gryder, most of which were for $ 300. On DeVille's disbursements journal the checks were designated as salary paid by DeVille to Cordial Gryder. The amounts represented by these checks were not reported by Mr. Gryder as income on his tax returns. In his testimony, Mr. Gryder stated that although "the checks were cut in my name" and endorsed by him the proceeds from the checks were given to Frank Cosentino who was a salesman for DeVille. He stated that Mr. Cosentino, who was a good salesman, was involved in some kind of garnishment and that his salary checks were made payable to Mr. Gryder in order to supply Mr. Cosentino with money until he could straighten out the garnishment proceeding. Mr. Gryder stated that after Mr. Cosentino got the garnishment proceeding straightened out he was placed back on the payroll. This testimony of Mr. Gryder's is contradicted by testimony of Ms. Hoch who stated that Mr. Cosentino was a commission salesman and drew different sums each week, depending on the number of vehicles *341 he had sold. She stated that any amounts due to Mr. Cosentino were paid him by checks drawn to him. On the basis of this record, we conclude that petitioners have failed to show that these checks drawn to Mr. Gryder are not properly includable in petitioners' income. The one item on which there is evidence in this record to indicate that the amount determined by respondent is overstated is the capital gain from the sale of the residence on Orchard Drive. Mrs. Gryder testified and documentary evidence in the record indicates that after this residence was purchased by Mr. Gryder an intercom system was installed, the garage was converted into a game room, the driveway was blacktopped, air conditioning was placed in the house, glass doors were installed to the patio and improvements were made to the swimming pool. The only evidence showing the amounts these improvements cost is Mr. Gryder's testimony from his memory. Mr. Gryder testified that the records which would have shown these costs were destroyed in a fire. At the trial of the instant case Pansy Gryder testified that she gave the records with respect to the Orchard Drive property to Cordial Gryder for safekeeping and did *342 not know where they were unless they were destroyed in a fire where certain records were stored. We conclude that the total cost of these various improvements was at least equal to the $ 4,675.50 which respondent determined as the gain on the sale of the Orchard Drive property. We therefore conclude that respondent was in error in determining a gain on the sale of this property by petitioners. Otherwise, we sustain respondent's determination with respect to the income of Cordial and Pansy Gryder for each of the years 1967, 1968, 1969, 1970 and 1971 except to the extent respondent has made concessions with respect to certain adjustments made in the notice of deficiency. There is nothing in this record to show error in the amount determined by respondent to be the income of DeVille for each of the years 1967 through 1970. Therefore, except to the extent that the parties have agreed to certain adjustments, we conclude that petitioners have failed to show any error in the determination by respondent of the income of DeVille for each of the years 1967, 1968, 1969 and 1970. Petitioner Pansy Gryder contends that she is an innocent spouse within the meaning of *343 section 6013(e). [8]This section provides that where a joint return has been made from which there is omitted gross income properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, the other spouse shall be relieved of liability for tax for such taxable year to the extent such liability is attributable to such omission from gross income if the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax attributable to such omitted income. We will assume here that the record establishes an omission from gross income attributable to Cordial Gryder in each of the years here in issue in excess of 25 percent of the amount of the gross income stated in the return for the purpose of discussing the application *344 of section 6013(e). It would appear that such is the fact, although until a recomputation is made this fact will not be completely clear with respect to each year. However, in our view Pansy Gryder has failed to show that she had no reason to know of the omission of gross income, and the evidence affirmatively shows that she significantly benefited from the items omitted from gross income. Mrs. Gryder testified that she really did not review the returns before she signed them. Mrs. Gryder knew of the unreported rental and dividend income and at least some of the unreported interest income. She also knew of the work being done at High Hill and the purchase of certain of the properties purchased in the names of Cordial and Pansy Gryder. She knew that many of the household bills for utilities and other items were not paid from her account or the joint account she had at the Jonesburg Bank with Cordial Gryder. Had she carefully reviewed the returns, she would have known of the omitted rental, interest and dividend income and would have questioned the source of the funds with which many of the payments for personal expenses of the Gryders were made and become aware of the omitted income. *345 *346 Furthermore, it is completely clear from this record that Mrs. Gryder significantly benefited from the omission from income from the joint returns she filed with Cordial Gryder. The record shows that all of the real estate purchased with funds from DeVille, except one piece, was in the joint names of Cordial and Pansy Gryder and that after Mr. Gryder's death on December 3, 1975, Mrs. Gryder had complete title to these properties. The record shows that upon condemnation of a part of the O'Fallon property in 1978, Mrs. Gryder received between $ 70,000 and $ 78,000 from the State of Missouri. The record also shows that Mrs. Gryder owned and, at the time of the trial, was operating the business of Gryder Motors. The record shows that although there was little in the probate estate of Mr. Gryder since most of the properties were in his name jointly with Mrs. Gryder, she was his sole heir and inherited any property which was in his probate estate. In our view it is not inequitable under these circumstances to hold Mrs. Gryder liable for the taxes on the omitted income. She is not liable for the addition to taxes for fraud since respondent has failed to establish in accordance with *347 the requirements of section 6653(b) any fraud on her part. The final issue is whether Cordial Gryder is a transferee at law or in equity of DeVille so as to make him liable for any part or all of the taxes and addition to taxes owed by DeVille. Section 6901(a)[9] provides for the method of collection of income taxes from a transferee of property of a taxpayer who is liable at law or in equity for the indebtedness of the transferor. Whether a transferee of property is liable for the transferor's indebtedness is determined under the laws of the state in which the property transfer occurred. Commissioner v. Stern, 357 U.S. 39, 42 (1958). Section 6902[10] provides that in cases before this Court the burden is on respondent to show that a taxpayer is liable as a transferee of property of a taxpayer but not to show that the taxpayer was liable for the tax. As we have heretofore held, DeVille is liable for the income taxes and addition to taxes under section 6653(b) as determined by respondent except to the extent that the amount of those taxes may be affected by issues which *348 were disposed of by agreement of the parties. *349 Mo. Ann. Stat. Sec. 428.020 (Vernon), provides that conveyances made with the intent to defraud creditors are void. This section states that: Every conveyance or assignment * * * of any estate or interest in lands, or in goods and chattels, or in things in action, or of any rents and profits issuing therefrom * * * made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions * * * debts or demands * * * shall be from henceforth deemed and taken, as against said creditors and purchasers, prior and subsequent, to be clearly and utterly void. Clearly, when a tax is owed to the Government, the Government is a creditor of the person owing the tax. Questions have been raised as to when the Government becomes a creditor. As we pointed out in Swinks v. Commissioner, 51 T.C. 13, 17 (1968): A transferee is liable retroactively for the transferor's taxes and additions to the tax in the year of the transfer to the extent of assets received from the transferor, even though the tax liability of the transferor was unknown at the time of the transfer. Sidney Kreps, 42 T.C. 660, 670 (1964), affd. 351 F.2d 1 (C.A. 2, 1965); Leon Papineau, 28 T.C. 54, 58 (1957); J. Warren Leach, 21 T.C. 70, 75 (1953). Therefore, the amount of taxes owed by DeVille in each of the years 1967 through 1970 as computed under our holding in this case, as well as the addition to taxes under section 6653(b) for each of those years was an indebtedness owed by DeVille to the Government. It is likewise clear from the evidence in this case that the various transfers made by DeVille to Cordial-Gryder by way of payment of his personal obligations and payment on land and property acquired and owned by him were conveyances or assignments of goods and chattels made without consideration. In Tockman v. Shower Doors, Inc., 568 S.W.2d 74, 78 (Mo. App. 1978), the court stated: The essential elements of a cause of action for a fraudulent conveyance include (1) a conveyance (2) of goods and chattles (3) with the intent to hinder, delay or defraud creditors. Section 428.020 RSMo. *350 1969. The sole contested issue at trial was the intent of the defendant in making the transfer. However, in arriving at the question of intent in a case of this kind Missouri courts have recognized that there are circumstances which are "badges of fraud" that may be employed to determine the presence of fraud. Among these are the following: 1. inadequate consideration for the conveyance; 2. a conveyance in anticipation of suit; 3. transfer of all or nearly all of the debtor's property; and 4. the debtor's insolvency subsequent to the conveyance. Allison v. Mildred, 307 S.W.2d 447, 454[7] (Mo. 1957); Morris v. Holland, 529 S.W.2d 948, 953[8,9] (Mo.App. 1975). In the instant case, not only was there no consideration for the transfer of funds of DeVille to Cordial Gryder but also the transfers were handled in such a manner as to result in an attempt to defraud the Government of rightfully due income taxes of DeVille. At the end of the series of transfers most of the property of DeVille had been transferred to petitioners.When the income tax and addition to tax of DeVille as determined by respondent, which determination we have *351 found to be substantially correct, is considered as an indebtedness of DeVille, DeVille was insolvent in 1968, 1969 and 1970. Applying the criteria set forth in Tockman v. Shower Doors, Inc., supra, it is clear that the transfers of property by DeVille to the Gryders in 1968, 1969 and 1970 are void under section 428.020 of the Revised Statutes of Missouri. After considering the income tax and addition to tax owed by DeVille for 1967 as an indebtedness of DeVille and adjusting for the distributions made by DeVille to Cordial Gryder, DeVille was not insolvent as of the end of 1967. However, under Missouri law it is the intent with which the conveyance is made that is the determining factor. As stated in Harrison v. Harrison, 339 S.W.2d 509, 513 (Mo.App. 1960): Under our statute, Section 428.020 RSMo 1949, V.A.M.S., every conveyance made with the intent to hinder, delay or defraud creditors is declared to be clearly and utterly void as to such creditors. While the insolvency resulting from a conveyance may be material evidence of fraud, the intent *352 with which the conveyance is made, and not the resulting insolvency, is the determining factor. And, as was said in Graff v. Continental Auto Insurance Underwriters, Springfield, Illinois, 225 Mo.App. 85, 35 S.W.2d 926, 931: "* * * the authorities hold that if the intent underlying the transaction was to do that which is forbidden by statute, then it is fraudulent and void as to creditors, whether the debtor be solvent at the time or not." In that case the court pointed out that where a transfer was a part of a comprehensive scheme by the debtor to dispose of all or substantially all of his assets by a series of conveyances, such voluntary transfers create a presumption of fraud and are void as to existing creditors. In the instant case the payments made in 1967 by DeVille of personal liabilities of Cordial Gryder were in the same nature as those made in subsequent years. Such voluntary conveyances made without consideration are the type of voluntary transfers which are presumptively fraudulent and void as to existing creditors under Missouri law. There is some question as to whether the Government was "an existing creditor" of DeVille with respect to the 1967 *353 taxes when the 1967 transfers were made. See Hartman v. Lauchli, 238 F.2d 881, 889 (8th Cir. 1956). However, the Government was an existing creditor for 1967 taxes when the transfers were made in 1968, 1969 and 1970. Also, since the 1967 transfers were treated on DeVille's books in such a manner as to fraudulently reduce its income, in our view respondent has shown that the 1967 transfers were made with the intent to defraud it as a creditor, even though as to the 1967 taxes it might be considered a "subsequent" creditor.Therefore, under Missouri law the 1967 transfers are also void. Compare Hartman v. Lauchli, supra at 889. On the basis of this record we hold that Cordial Gryder is liable for the taxes and addition to taxes due from DeVille on the transfer of assets of DeVille to the extent of the distributions made to him by DeVille either directly or by payments of his personal obligations and payments with respect to property acquired in his name or jointly in his name with Pansy Gryder. [11] The amount of such transfers can be computed from the facts we have found in this case. *354 Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. At the time of the trial of this case Pansy Gryder had remarried. However, she was referred to during the trial as Pansy Gryder or Mrs. Gryder and will be so referred to herein.↩
*. All amounts were payments made with respect to the Orchard Drive property which was owned by Cordial Gryder and was the principal residence of Cordial and Pansy Gryder. Except for a minor amount paid for an escrow shortage, the payments were for interest and principal on the mortgage on the property.↩
*. First listed as "Bonne Terre," which was crossed out and replaced by FDIC. ** DeVille's 1971 Federal income tax return is not in the record in this case.↩
3. Cordial Gryder was indicted on five counts of willfully subscribing a return for each of the years 1967, 1968, 1969, 1970 and 1971 that was verified by a declaration that it was made under penalty of perjury which he did not believe to be true and correct as to every material matter. The case was tried in the United States District Court for the Eastern District of Missouri, United States v. Cordial D. Gryder↩, Docket No. 75-52 CR(2). Mr. Gryder was convicted after a month's trial before a jury. An appeal was taken by Mr. Gryder to the United States Court of Appeals for the Eighth Circuit. On December 3, 1975, during the pendency of this appeal Mr. Gryder died. Following Mr. Gryder's death, the circuit court remanded the case to the district court, directing a reversal of the conviction on the basis that because of Mr. Gryder's death it was unnecessary to decide the issues raised on appeal. Although the trial of the instant case consumed about two weeks, the parties stipulated much of the testimony and many of the exhibits in the criminal case into the record in this case. Transcripts of the testimony of other witnesses, including the testimony of Cordial Gryder, were offered and received in evidence in this case, some parts by petitioner and some parts by respondent. The record in this case, when completed, contained most of the evidence received in the criminal case as well as other evidence.
*. The March 8, 1968, payment was for back taxes due on the Horse Shoe Bend lot. The other three payments were on the note secured by the Horse Shoe Bend property.↩
4. The distributions to C. D. Gryder on this schedule vary slightly from those shown in the notice of deficiency. We have not found an explanation in the record for these slight variances. However, their effect on DeVille's net worth is not sufficient to affect the solvency of DeVille.↩
*. Deductions claimed on returns which were disallowed in notice of deficiency. ** Distributions to Cordial D. Gryder in excess of current year's income.↩
5. Section 6501(c)(1) provides as follows: SEC. 6501.LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
6. Although Mr. Gryder was deceased at the time of the trial of this case, his testimony in full at the criminal trial, as was most of the other testimony at that trial, was made a part of the record in this case.↩
7. Section 6653(b) provides as follows: SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
8. Section 6013(e) provides as follows: Sec. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. (e) Spouse Relieved of Liability in Certain Cases. -- (1) In general. Under regulations prescribed by the Secretary, or his delegate, if -- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
9. Section 6901(a)(1)(A)(i) provides as follows: SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. -- The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes. -- (A) Transferees. -- The liability, at law or in equity, of a transferee of property -- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), ↩
10. Section 6902(a) provides as follows: SEC. 6902.PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof. -- In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.↩
11. The facts in this record are clear that at the time respondent determined the tax liabilities of DeVille, that corporation had ceased to exist and had no assets. For this reason any attempt to collect from DeVille before determining the transferee liability against Mr. Gryder would have been useless and for that reason was not required.↩